UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONDUIT TECHNOLOGY, INC.,<br><br>Plaintiffs,<br><br>-against-<br><br>TETHER HOLDINGS S.A. DE C.V., TETHER INTERNATIONAL S.A. DE C.V., TETHER OPERATIONS S.A. DE C.V., AND TETHER INVESTMENTS S.A. DE C.V.,<br><br>Defendants. | ECF CASE<br><br>Civil Case No.:1:26-cv-08773<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1. This action arises from Tether's[1] improper taking of over millions of dollars from Plaintiff Conduit Technology, Inc. ("Conduit"). Conduit stored its money in a digital wallet in the form of Tether's digital currency, USD₮, and Tether exerted control over the digital currency to take Conduit's money from it. Tether has no legal entitlement to these funds and no claim to them. Conduit owes no money to Tether and has no obligation to Tether. The funds are unequivocally Conduit's, but Tether has taken them and is denying Conduit access to them.

2. On numerous occasions, Conduit has asked Tether to return the funds—or to even provide a purported justification for Tether's improper taking. Tether has refused to do either.

3. Tether has no justifiable basis to take and withhold Conduit's money from it, and Conduit has been harmed as a result.

4. Conduit is an American company, founded in 2021, that operates a leading cross-border payments platform. Conduit's platform allows companies to seamlessly transact in and out of stablecoins[2] and local fiat currencies, between a wide range of networks and domestic payment

[1] Tether or Defendants refers collectively to Tether Holdings S.A. DE C.V., Tether International S.A. DE C.V., Tether Operations S.A. DE C.V., and Tether Investments S.A. DE C.V.

[2] A "stablecoin" is a digital asset designed to maintain a stable value by pegging its worth to a reference asset, such as a fiat currency or a physical asset like gold. Their stable value is crucial for cross-border payment solutions because

rails, including across Latin America, Africa, and Asia. As part of the services it provides, Conduit relies on stablecoins to move money across borders faster and more efficiently than traditional banking. Conduit also stores its own funds in stablecoins for ease of access and transferability. Like many businesses, Conduit's ability to access its funds is integral to its business.

5. Tether is the issuer of USD₮ (also known as USDT), the world's most widely used stablecoin. Tether markets USD₮ as a "digital dollar": stable, fully backed by reserves, and freely transferable. Businesses like Conduit—and millions of individuals around the world—rely on Tether's promise that their funds will be freely accessible and transferable.

6. In May of 2025, Conduit started storing $2.76 million of its working capital in a digital treasury wallet[3] in the form of USD₮. Conduit chose to store the money in USD₮ in particular because of the widespread use of USD₮, its ease of access, and its transferability. The sole purpose of this wallet was to store Conduit's working capital, and it served as the digital equivalent of the company's operating bank account. As a result, Conduit's access to these funds is particularly important to the company.

7. In September of 2025, Tether chose to freeze all $2.76 million of Conduit's money and, in doing so, took constructive possession of those funds. It did so of its own initiative and without any stated reason to Conduit.

8. As of September 24, 2025, Conduit has not been able to access any of this money—a significant portion of the working capital Conduit uses to run its business and help perform services for the companies that rely on Conduit's platform.

9. To date, Tether has provided no justification for taking Conduit's funds out of its digital wallet.

10. It has none.

11. Tether is not allowed to take money from businesses just because they chose to store that money in Tether's currency. Tether also has not substantively responded to Conduit's

---

it ensures that users can transfer funds without the risk of significant value fluctuation. USD₮ is a fiat-backed stablecoin specifically referenced to the U.S. dollar.

[3] Conduit's Wallet is a Fireblocks wallet at address TMk5ji4vTGZG8E1RnKEYvaK6kgNobLSTtE.

multiple requests for it to unfreeze and thus return the funds to Conduit.

12. Tether has instead repeatedly referred Conduit to a contact with the Brazilian Federal Police (the "Federal Police") with absolutely no context for the referral. But Conduit, through its Brazilian legal counsel, has spoken to Federal Police. The Federal Police have verified what Tether has long suspected: Tether has no justification for its actions. The Federal Police have confirmed not only that they did not identify Conduit's wallet for freezing, but also that they do not even know what evaluation criteria (if any) led Tether to freeze the funds.

13. The Federal Police confirmed that they had previously identified certain wallets that they requested Tether to freeze, in connection with an investigation into a third party, Onix Intermediações Ltda. ("Onix"), which at one point in time used Conduit's platform.

14. But Conduit's treasury wallet was never used by Onix, does not hold any Onix funds, and has never held any Onix funds.

15. *In fact, Conduit's treasury wallet did not even exist when Onix was using Conduit's platform.*

16. Onix's last transaction using Conduit's platform was on April 22, 2025. Conduit's treasury wallet was created nearly a month later, on May 20, 2025. In the four months during which Conduit's wallet operated (*i.e.*, before Tether wrongly took possession of Conduit's funds), the wallet processed 4,427 transactions across 78 counterparties and more than $1.1 billion in volume. Not one of those transactions involved Onix, or any entity connected to it. This is publicly verifiable on the blockchain to anyone with access to the internet—including to Tether.

17. Further, and notably, the Brazilian Criminal Court has acknowledged that Conduit itself is not among the investigated parties and is not among the companies whose assets were ordered frozen. Tether has thus acted on its own initiative to freeze and seize control of Conduit's funds, based on its own undisclosed criteria.

18. Conduit has repeatedly requested that Tether unfreeze its wallet because Conduit's lack of access to these funds (the "Converted Funds") is materially impacting its business. Tether has refused to do so. Meanwhile, Tether profits from the freeze: it continues to invest the U.S.

dollar reserves backing the frozen tokens—predominantly in U.S. Treasury securities—and to earn interest on them. In other words: Tether is reaping the financial rewards of its unjustifiable taking of Conduit's money.

19. Conduit brings this action to recover its property, to obtain a declaration that Tether has no right to freeze or withhold the Converted Funds, and to hold Tether accountable for the harm its unlawful conduct has caused and continues to cause.

**PARTIES**

20. Plaintiff Conduit Technology, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Delaware. Conduit is a citizen of the United States.

21. Defendants are Tether Holdings S.A. de C.V., Tether International, S.A. de C.V., Tether Operations, S.A. de C.V. and Tether Investments, S.A. de C.V.

22. On information and belief, Tether Holdings S.A. de C.V., is the holding company of Tether International, S.A. de C.V., Tether Operations, S.A. de C.V., and Tether Investments, S.A. de C.V.

23. Tether Holdings S.A. de C.V., is a citizen of the Republic of El Salvador.

24. Tether International, S.A. de C.V., is a citizen of the Republic of El Salvador. On information and belief, this entity was previously known as Tether International Limited and was a company incorporated in the British Virgin Islands before it redomiciled to El Salvador in 2025.

25. Tether Operations, S.A. de C.V., is a citizen of the Republic of El Salvador.

26. Tether Investments, S.A. de C.V., is a citizen of the Republic of El Salvador.

27. Defendants are the issuers of USD₮. On information and belief, Defendants jointly operate the Tether platform and jointly control the administrative functions of the USD₮ on each blockchain on which USD₮ is issued; each participated in, authorized, or ratified the conduct alleged herein; and the responsibilities of each Defendant is uniquely within Defendants' knowledge.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction under 28 U.S.C. § 1332. Conduit is a citizen of the United States. On information and belief, each Defendant is a citizen of El Salvador. The amount in controversy exceeds $2.75 million, exclusive of interest and costs.

29. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367. The Fourth Cause of Action raises substantial questions of federal law under 18 U.S.C. §1030(a)(5). Conduit's related state law claims form part of the same controversy, as they have a common nucleus of operative facts, relate to the same parties and events, and will require the same witnesses and evidence.

30. This Court has personal jurisdiction over each Defendant pursuant to Federal Rule of Civil Procedure 4(k)(2). The Defendants transact business in New York and in the United States, and Conduit's claims arise from and relate to that activity.

31. Defendants' business is built on the U.S. dollar. Every USD₮ is a dollar-denominated instrument. Defendants' reserves are held predominantly in United States Treasury securities and other dollar-denominated assets.

32. Cantor Fitzgerald, L.P., a New York headquartered financial services firm, has served as the primary custodian of the United States Treasury securities backing USD₮ since around 2021. On information and belief, Cantor Fitzgerald holds substantially all of Defendants' Treasury bond portfolio—on the order of $130 billion or more—in New York. In 2023, Cantor Fitzgerald's then-chief executive, Howard Lutnick, publicly confirmed the custody relationship, stating: "I hold their Treasuries, and they have a lot of Treasuries."[4]

33. Defendants make USD₮ readily available in the United States, including in this District, by providing for it to trade on U.S.-based digital asset exchanges. For instance, USD₮ is available for purchase on Gemini, which is headquartered in this District, and on Coinbase, which maintains its principal executive office in New York.

---

[4] Steven Stradbrooke, Cantor CEO Says He's Got Tether's T-Bills, So Where's the Audit?, CoinGeek (Dec. 14, 2023).

34. On information and belief, Defendants' U.S. dollar transactions—including the receipt and disbursement of dollars in connection with the issuance and redemption of USD₮ and the management of Defendants' reserves—are cleared through correspondent bank accounts in New York banks.

35. For claims arising under federal law, personal jurisdiction over each Defendant also exists under Federal Rule of Civil Procedure 4(k)(2), based on Defendants' contacts with the United States as a whole, and the Court has pendent personal jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367.

36. Venue lies in this District under 28 U.S.C. § 1391(c)(3), because no Defendant resides in the United States. In addition, substantial assets of Defendants are situated in this District, including the Treasury securities custodied through Cantor Fitzgerald that back the USD₮ in circulation, and—on information and belief—the USD₮ in Conduit's Wallet.

## FACTUAL ALLEGATIONS

### A. Tether Markets USD₮ as the Digital Dollar

37. Defendants issue USD₮ and represent that it is backed by the equivalent amount of U.S. dollar assets on a one-to-one basis. Defendants promote USD₮ as a "digital dollar"—a stable, fully backed, and freely transferable digital representation of the U.S. dollar.

38. On information and belief, USD₮ is the most widely used stablecoin in the world, commanding approximately 70% of the stablecoin market by trading volume. Its aggregate market capitalization exceeds $180 billion. In 2025, Defendants reported net profits of over $10 billion.

### B. Conduit's Business and Conduit's Wallet

39. Conduit operates hundreds of wallets. Many are client transactions wallets, created solely for executing customer transactions. Clients send money in one currency, and Conduit pays them back in another. Conduit connects with local rails to make this an efficient process, and it utilizes different stablecoins to effectuate these transfers. Because USD₮ is so ubiquitous, it has been an obvious choice for Conduit to transfer and hold funds.

40. Separately, Conduit also maintains treasury wallets that exist solely to hold

Conduit's own funds as working capital. These wallets are not available to customers, are not used to hold customer funds, and are not used to execute transactions. They are a holding place for funds Conduit can use to pre-fund and settle client transactions across its payment corridors. Conduit has historically maintained these funds in stablecoins, such as USD₮, because of the ease of access and transferability.

41. The wallet at issue is a treasury wallet—a Fireblocks wallet at address TMk5ji4vTGZG8E1RnKEYvaK6kgNobLSTtE (the "Wallet"), which was created on May 20, 2025. The Wallet is held in Conduit's Fireblocks institutional custody account and, as of September 30, 2026, held approximately $2.76 million in USD₮.

42. Only Conduit's treasury personnel have signing authority for the Wallet, and no external party has ever held signing authority. The authorized signers are all Conduit employees. Every transaction from the Wallet was authorized by named Conduit employees, not by any customer or external party.

**C. The Brazilian Investigation and Tether's Freezing of the Wallet**

43. In June 2024, the Brazilian Federal Police began an investigation into individuals and entities related to Bull Intermediação de Negócios Ltda. ("BULL")—a financial intermediary that shares common ownership with Onix. Conduit is not related to BULL, Conduit is not related to Onix, and Conduit's name has not appeared in any proceeding related to the investigation. The Brazilian Criminal Court has itself acknowledged that Conduit is not among the investigated parties, nor is it among the companies whose assets were frozen by a precautionary measure.

44. On September 16, 2025, the Federal Police produced a Judicial Police Analysis Report on the telematic data of the investigated parties. The report identifies certain wallets associated with BULL and its affiliated entities but does not mention Conduit by name or identify Conduit's Wallet.

45. Despite Conduit's lack of connection to BULL or Onix, and lack of identification by the Federal Police, on September 24, 2025, Tether froze Conduit's Wallet along with other wallets that were frozen in connection with the investigation. Tether identified the Wallet on its

own initiative using its own criteria, which it has not disclosed or explained.

46. Later documents submitted to the Brazilian courts by the Federal Police make clear that Tether froze Conduit's Wallet on its own initiative. The Federal Police explained in a July 1, 2026 submission that: (1) the Federal Police identified wallets under suspicion based on cloud data; (2) those addresses (which did not include the Wallet) were forwarded to Tether's T3 Financial Crime Unit ("T3 FCU") in a virtual meeting; and (3) T3 FCU used its own criteria to decide which wallets would be subject to freezing. Tether then froze the wallets on their own autonomy.

47. To be clear, Conduit's Wallet and the Converted Funds were not identified in Step 1 of that process or forwarded to Tether in Step 2 of that process. Tether's internal unit identified Conduit's Wallet, and Tether on its own initiative and authority decided to freeze the Wallet and take possession of the Converted Funds. Put simply: the Wallet was not frozen on the Federal Police's initiative.

48. The Federal Police has since confirmed that Conduit's Wallet was not on the list of wallets it originally identified and that they do not know which evaluation criteria led Tether to direct the freezes.

49. In sum, Tether—on its own initiative—identified, froze, and thus took possession of $2.76 million in Conduit's Wallet, without Conduit or its Wallet being a subject of the investigation, and without any basis to do so. The Wallet was never used by BULL or ONIX, and it does not contain funds from either entity or their associated entities.

**D. Conduit Has Suffered Harm While Tether Profits**

50. Conduit has been severely harmed by its inability to access its working capital over the past year. By freezing approximately $2.76 million in the Wallet, Defendants cut off a substantial portion of the capital Conduit uses to run its core business. Before the freeze, the Wallet processed more than $1.1 billion in volume in approximately four months.

51. Without access to the Converted Funds, Conduit has been unable to pre-fund and settle client transactions at its prior volume and speed. The resulting liquidity shortfall has had an

impact on the volume of transactions Conduit can facilitate resulting in direct harm to its business and threatens to impact its goodwill in the cross-border payments market.

52. The freeze has also harmed Conduit's workforce. Because of the financial strain the freeze has caused, Conduit has been forced to lay off employees and close offices. This has not only impacted the volume of Conduit's transactions (losing it business), but it has also taken jobs away from many of Conduit's workers.

53. Every additional day the freeze remains in place deepens the damage already done.

54. In contrast, Defendants have profited directly from the freeze. On information and belief, Defendants use the dollars they receive when they issue USD₮ to purchase interest-bearing instruments, predominantly U.S. Treasury securities custodied in New York. When Defendants freeze USD₮, they retain and continue to invest the corresponding reserves for their own account. The freeze costs Defendants nothing and preserves for them the interest the reserves generate.

**E. Tether's Refusal to Unfreeze the Funds**

55. Conduit has repeatedly asked Tether to unfreeze and thus return the Converted Funds in the Wallet. Specifically, Conduit reached out to Tether on at least June 10, 2026, June 15, 2026, June 18, 2026, June 23, 2026. Tether responded either that it was following up regarding Conduit's inquiry or by referring Conduit to the Federal Police. Conduit responded, explaining that it was in touch with the Federal Police, the Federal Police had confirmed that the Wallet was not on the list of wallets that the Federal Police were interested in investigating, and provided documentation in support. At no point did Tether agree to return the Converted Funds or provide an explanation for the freeze.

56. On August 19, 2026, Conduit's counsel sent a detailed letter to Tether setting forth the factual basis demonstrating the freeze was unjustified and demanding that Tether unfreeze the Wallet within five business days.

57. Tether provided no response.

## FIRST CAUSE OF ACTION

## Conversion Under New York Law

58. Plaintiff repeats and realleges the allegations contained in all preceding paragraphs as if fully set forth herein.

59. Conduit is the owner of, and has the immediate right to possess and control, the Converted Funds in its Wallet. Conduit holds the private keys through its Fireblocks institutional custody account and is the sole party with signing authority; only Conduit's treasury personnel can authorize transactions, and no external party has ever held signing authority.

60. On September 24, 2025, Defendants intentionally exercised control over Conduit's USD₮ by freezing Conduit's Wallet.

61. Defendants' exercise of dominion and control over the Converted Funds was undertaken on Defendants' own initiative and unjustified.

62. Defendants' freeze was a serious and material interference with Conduit's right to possess, use, and transfer the Converted Funds, not a qualified or temporary measure taken in good faith, but an absolute deprivation maintained for nearly a year despite Conduit's repeated demonstrations that the freeze lacks justification.

63. Conduit demanded on multiple occasions that Defendants unfreeze the Wallet. Defendants refused absolutely by failing to do so.

64. As a direct and proximate result of Defendants' conversion, Conduit has suffered damages in an amount to be determined at trial, but in no event less than $2.76 million, plus consequential damages including lost business opportunities, liquidity harm, and damage to Conduit's business relationships.

65. Defendants obtained and retain the Converted Funds, and the reserve assets attributable to them, through wrongful conduct, and their retention of those assets is unjust. Conduit is therefore entitled to a constructive trust over the Converted Funds, the reserve assets attributable to them, and all interest, income, and proceeds derived from them.

66. In the alternative, Conduit is entitled under CPLR Article 71 to recover possession of the Converted Funds. Conduit has a superior possessory right to the Converted Funds, and Defendants, having taken constructive possession of them, have refused Conduit's demands for their return.

**SECOND CAUSE OF ACTION**

**Unjust Enrichment Under New York Law**

67. Conduit repeats and realleges the allegations contained in all preceding paragraphs as if fully set forth herein.

68. There is no valid and enforceable contract between Conduit and any Defendant that covers the subject matter of this dispute.

69. Conduit conferred a benefit to Tether by acquiring and holding approximately $2.76 million in USD₮. Each token is backed by reserve assets that Tether holds and invest, predominantly in U.S. Treasury securities that generate interest and income for Tether.

70. Tether has been enriched. By freezing Conduit's USD₮, they eliminated any possibility that the tokens could be transferred or redeemed, relieving themselves of any obligation while retaining the reserves and the returns.

71. Tether was aware that Conduit was not providing the benefit gratuitously. Tether knew that holders like Conduit expected to use and transfer USD₮ freely as a stable, fully backed digital dollar.

72. Conduit has demanded that Tether return or restore the benefit and unfreeze the Wallet on multiple occasions, including through a formal demand letter sent by Conduit's counsel on August 19, 2026. Defendants refused and have failed to restore the benefit.

73. It is inequitable for Tether to retain the benefit. Defendants froze Conduit's USD₮ without justification and acting on their own initiative. Defendants continue to profit while Conduit remains deprived of $2.76 million in working capital and suffers ongoing business harm.

74. Conduit and Defendants had a sufficiently close relationship or connection as to cause reliance and inducement by Conduit. Defendants are the centralized issuers and controllers

of USD₮, market it as a digital dollar, retain exclusive technological control over the freeze and destroy functions, and encourage Conduit to rely on USD₮'s stability and free transferability. That relationship is further reflected in Conduit's reliance on Defendants' representations in acquiring and holding USD₮ for working capital, and Conduit's lack of any practical ability to protect itself against a freeze or restore access to its property.

75. Conduit has suffered damages, including the ongoing deprivation of $2.76 million in working capital, liquidity harm, lost business opportunities, and damage to its business relationships, together with the interest and income attributable to its Converted Funds.

76. It is against equity and good conscience to permit Defendants to retain the benefit Conduit conferred.

77. Defendants obtained and retain the Converted Funds, and the reserve assets attributable to them, through wrongful conduct, and their retention of those assets is unjust. Conduit is therefore entitled to a constructive trust over the Converted Funds, the reserve assets attributable to them, and all interest, income, and proceeds derived from them.

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty Under New York Law

78. Plaintiff repeats and realleges the allegations contained in all preceding paragraphs as if fully set forth herein.

79. At all relevant times, Defendants had a fiduciary relationship with Conduit. That relationship arose because Defendants are the sole issuers and centralized controllers of USD₮; market USD₮ as a stable, freely transferable digital dollar backed one-to-one by dollar-denominated reserves; encourage businesses and individuals worldwide to rely on it as a medium of exchange and store of value; retain exclusive technological control over the freeze and destroy functions while holders like Conduit have no ability to protect themselves against that power; and hold and invest the reserve assets backing USD₮ for their own account. This combination of exclusive control, encouraged reliance, and information asymmetry created a relationship of trust and confidence between Defendants and Conduit. Users like Conduit relied on Defendants to

maintain the integrity and accessibility of USD₮, and Defendants assumed fiduciary duties to holders of USD₮, including duties of loyalty, good faith, and fair dealing, and a duty not to exercise their freeze or destroy power arbitrarily or without justification.

80. Defendants breached these duties by freezing Conduit's Wallet without justification; refusing to unfreeze the Wallet despite Conduit's repeated demands and the absence of any legitimate basis for the freeze; profiting from the freeze through the continued retention and investment of the reserve assets attributable to Conduit's Converted Funds; and failing to disclose to the market the scope and arbitrary nature of their capabilities.

81. As a direct and proximate result of Defendants' breach of fiduciary duty, Conduit has suffered monetary damages in an amount to be determined at trial, including the loss of access to $2.76 million in working capital, liquidity harm, lost business opportunities, and damage to Conduit's business relationships.

82. Conduit is entitled to equitable relief, including disgorgement of the benefits and profits Defendants improperly received from continuing to retain and invest the reserve assets attributable to Conduit's frozen USD₮.

83. Defendants' misconduct has caused and will continue to cause Conduit irreparable harm for which no adequate remedy at law exists, including the ongoing deprivation of $2.76 million in working capital needed to support its business and client transactions. Defendants' misconduct was willful, wanton, and in reckless disregard of Conduit's rights, evincing a high degree of moral culpability and warranting an award of punitive damages.

**FOURTH CAUSE OF ACTION**

**Computer Fraud (18 U.S.C. §1030(a)(5))**

84. Plaintiff repeats and realleges the allegations contained in all preceding paragraphs as if fully set forth herein.

85. At all relevant times, the computers, servers, and networked infrastructure through which Defendants issue, administer, and control USD₮ constitute "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2), because they are computers used in and affecting interstate

and foreign commerce and communication.

86. On September 24, 2025, Defendants knowingly used their administrative control over the USD₮ platform to freeze Conduit's Wallet, rendering it unable to send or receive USD₮. On information and belief, Defendants accomplished the freeze by transmitting a command or series of commands through their computers and networked systems that altered the status of Conduit's Wallet on the blockchain, blocking all transfers of USD₮ to or from the Wallet.

87. Defendants' conduct was without authorization or, in the alternative, exceeded any authorized access Defendants may have had, and as a result intentionally caused damage without authorization to a protected computer, within the meaning of 18 U.S.C. § 1030(a)(5)(A).

88. Defendants' conduct has caused damage and loss to Conduit within the meaning of 18 U.S.C. § 1030(e)(8) and (e)(11), aggregating at least $5,000 in value during a one-year period, including the deprivation of $2.76 million in working capital, liquidity harm, lost business opportunities, and costs incurred in investigating and responding to the freeze.

89. Pursuant to 18 U.S.C. § 1030(g), Conduit is entitled to maintain a civil action and to obtain compensatory damages, injunctive relief, and other equitable relief.

**FIFTH CAUSE OF ACTION**

**Declaratory Judgment (28 U.S.C. §§ 2201–2202)**

90. Plaintiff repeats and realleges the allegations contained in all preceding paragraphs as if fully set forth herein.

91. An actual controversy exists between Conduit and Defendants within the meaning of 28 U.S.C. § 2201. Defendants assert and exercise a claimed right to freeze, restrain, or otherwise interfere with Conduit's USD₮ without justification, while Conduit disputes that right.

92. No court order, warrant, decree, subpoena, levy, restraining order, or legal process of any kind—issued by any court, agency, or other authority, in the United States—directed, authorized, or compelled Defendants to freeze Conduit's Wallet.

93. The Federal Police investigation does not target Conduit. The Brazilian Criminal Court has acknowledged that Conduit is not among the investigated parties. The Federal Police

have confirmed that Conduit's Wallet was not on the list of wallets they originally identified. Tether acted on its own initiative, through its T3 Financial Crime Unit, based on its own private criteria.

94. Defendants are not custodians of Conduit's USD₮ in the Wallet and do not have a lawful right to possess or control any account of Conduit. Conduit never consented, expressly or impliedly, to Defendants' exercise of control over its property. Defendants may possess a technological capability to interfere with USD₮ held by strangers, but that capability gives them no legal right to exercise it as to Conduit's USD₮.

95. Conduit is entitled to a declaratory judgment that:

a. Defendants have no legal authority to freeze, restrain, or otherwise interfere with Conduit's USD₮ in its Wallet;

b. The freeze of Conduit's Wallet is without legal basis and is unlawful;

c. Defendants must immediately unfreeze Conduit's Wallet and restore Conduit's full access to and control over its USD₮; and

d. Defendants have no right, title, interest, or claim in or to Conduit's USD₮.

**SIXTH CAUSE OF ACTION**

**Accounting Under New York Law**

96. Conduit repeats and realleges the allegations contained in all preceding paragraphs as if fully set forth herein.

97. As alleged above, Defendants owe Conduit fiduciary duties and breached them by freezing the Wallet without justification and retaining and investing the reserve assets attributable to the Converted Funds for their own benefit.

98. The disposition of those reserve assets, the interest and income earned on them, and the criteria Defendants used to freeze the Wallet are known only to Defendants, who have refused Conduit's demands for an explanation. Conduit has no adequate remedy at law because the full amount owed cannot be determined without this information.

99. Conduit is entitled to a full accounting of the reserve assets attributable to the Converted Funds and all interest, income, and profits Defendants have earned on them since September 24, 2025.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Conduit Technology, Inc. respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally, as follows:

a. A declaration, pursuant to 28 U.S.C. §§ 2201–2202, that Defendants have no legal authority to freeze, restrain, or otherwise interfere with Conduit's USD₮ in its Wallet; that the freeze of Conduit's Wallet is without legal basis and is unlawful; that Defendants must immediately unfreeze Conduit's Wallet and restore Conduit's full access to and control over its USD₮; and that Defendants have no right, title, interest, or claim in or to Conduit's USD₮;

b. Injunctive relief directing Defendants to immediately unfreeze Conduit's Wallet at address TMk5ji4vTGZG8E1RnKEYvaK6kgNobLSTtE and to restore Conduit's full access to and control over the USD₮ held therein;

c. Compensatory damages in an amount to be determined at trial, but in no event less than $2,760,000.00, plus consequential damages for lost business opportunities, liquidity harm, and interference with Conduit's business relationships;

d. Restitution and disgorgement of all interest, income, and profits Defendants have earned on the reserve assets attributable to Conduit's frozen USD₮;

e. Imposition of a constructive trust, for Conduit's benefit, over the Converted Funds, the reserve assets attributable to them, and all interest, income, and proceeds derived from them;

f. In the alternative to the injunctive relief requested above, an order of replevin directing Defendants to return possession of the Converted Funds to Conduit;

g. A full accounting by Defendants of the reserve assets attributable to the Converted Funds and all interest, income, and profits earned on them;

h. Punitive damages in an amount to be determined at trial;

i. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

j. Costs and attorneys' fees to the extent permitted by law;

k. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff Conduit Technology, Inc. hereby demands a trial by jury on all issues so triable.

Dated: October 5, 2026

BAKER BOTTS L.L.P.

By: */s/ Karan Singh Dhadialla*

Nischay K. Bhan
nischay.bhan@bakerbotts.com
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-2500

Matthew Jacobs (*pro hac vice* forthcoming)
matt.jacobs@bakerbotts.com
Chinmayi Manjunath (*pro hac vice* forthcoming)
chinmayi.manjunath@bakerbotts.com
Karan Singh Dhadialla (*pro hac vice* forthcoming)
karan.dhadialla@bakerbotts.com
101 California Street, Suite 3200
San Francisco, California 94111
Telephone: (415) 291-6200

*Attorneys for Plaintiff*
CONDUIT TECHNOLOGY, INC.